# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**  JOHNSON & JOHNSON, a New Jersey corporation
*(AVISO AL DEMANDADO):* doing business in California; JOHNSON & JOHNSON
CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES,
INC., a New Jersey corporation doing business in California; IMERYS TALC
AMERICA, INC., a Delaware Corporation with its principal place of business in the
State of California; and DOES 1 through 100, inclusive



**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**02/01/2019** at 05:14:40 PM
Clerk of the Superior Court
By Candace Schaeffer,Deputy Clerk

RECEIVED
FEB 1 3 2019
Department

**YOU ARE BEING SUED BY PLAINTIFF:**  STEVE HAGGERTY, an Individual,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*  and as Successor in Interest for
MARIA MACIAS

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es:)* | **CASE NUMBER:** *(Número del Caso:)* 37-2019-00006541-CU-MT-CTL |
|---|---|

SUPERIOR COURT OF THE STATE OF CALIFORNIA
330 W. BROADWAY

SAN DIEGO, CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es:)*

Mark P. Robinson, Jr.             949-720-1288             949-720-1292
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

| DATE: *(Fecha)* 02/04/2019 | Clerk, by _____ C. Schaeffer _____, Deputy *(Secretario)* *(Adjunto)* |
|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)       ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

---

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

| | SUM-100 |
|---|---|

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:** JOHNSON & JOHNSON, a New Jersey corporation
*(AVISO AL DEMANDADO):* doing business in California; JOHNSON & JOHNSON
CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES,
INC., a New Jersey corporation doing business in California; IMERYS TALC
AMERICA, INC., a Delaware Corporation with its principal place of business in the
State of California; and DOES 1 through 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** STEVE HAGGERTY, an Individual,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* and as Successor in Interest for
MARIA MACIAS

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**02/01/2019** at 05:14:40 PM

Clerk of the Superior Court
By Candace Schaeffer, Deputy Clerk

RECEIVED

FEB 13 2019

Law Department

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>330 W. BROADWAY<br><br>SAN DIEGO, CA 92101 | **CASE NUMBER:**<br>*(Número del Caso):* 37-2019-00006541-CU-MT-CTL |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark P. Robinson, Jr.                                949-720-1288                    949-720-1292
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

| DATE:<br>*(Fecha)* 02/04/2019 | Clerk, by _____ C. Schaeffer _____ , Deputy<br>*(Secretario)*                                                   *(Adjunto)* |
|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 (Rev. July 1, 2009) | **SUMMONS** | Legal<br>Solutions<br>Plus | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

Mark P. Robinson, Jr., Esq., State Bar No. 54426
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Tel.: (949) 720-1288
Fax.: (949) 720-1292
mrobinson@robinsonfirm.com

Michelle Parfitt, Esq.
Patrick Lyons, Esq.
**ASHCRAFT & GEREL, LLP**
4900 Seminary Road, Suite 650
Alexandria, Virginia  22311
Tel.: (703) 931-5500
Fax.: (703) 820-1656
mparfitt@ashcraftlaw.com
plyons@ashcraftlaw.com
**(Pro Hac Vice Admission Anticipated)**

**Attorneys for Plaintiff**
STEVE HAGGERTY, Individually and as
Successor-in-Interest for MARIA MACIAS

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**02/01/2019** at 05:14:40 PM

Clerk of the Superior Court
By Candace Schaeffer, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

STEVE HAGGERTY, an Individual, and as
Successor in Interest for MARIA MACIAS,

        Plaintiff,

  v.

JOHNSON & JOHNSON, a New Jersey
corporation doing business in California;

JOHNSON & JOHNSON CONSUMER INC.
F/K/A JOHNSON & JOHNSON CONSUMER
COMPANIES, INC., a New Jersey corporation
doing business in California;

IMERYS TALC AMERICA, INC., a Delaware
Corporation with its principal place of business in
the State of California;

and DOES 1 through 100, inclusive,

        Defendants.

**CASE NO.** 37-2019-00006541-CU-MT-CTL

**COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL**

Date Served: 2/13/19
Company Served: _____

Q+Q / 99CI
2019 002668   (N)      BP
Personal Service        KMG

1

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    Plaintiff herein, by and through counsel, for causes of action against the Defendants, alleges as
2    follows:

3                    **PARTIES, JURISDICTION AND VENUE**

4        1.    Plaintiff STEVE HAGGERTY is a competent individual, over the age of 18, and a citizen
5    of the United States.

6        2.    Venue of this case is appropriate in the Superior Court of the State of California, County of
7    San Diego because injury to and death of Plaintiff's Decedent occurred in this County.

8        3.    This suit arises out of and relates to Defendants' contacts with the State of California, and
9    occurrences within the State of California. During relevant times, Plaintiff's Decedent was a resident of
10   the State of California. During relevant times, Plaintiff's Decedent purchased JOHNSON & JOHNSON's
11   and JOHNSON & JOHNSON CONSUMER, INC.'s talc-based products known as Johnson & Johnson
12   Baby Powder and Shower to Shower (hereinafter "the PRODUCTS"), from a source within the State of
13   California.   During relevant times, Plaintiff's Decedent purchased JOHNSON & JOHNSON's and
14   JOHNSON & JOHNSON CONSUMER, INC.'s PRODUCTS as a result of being exposed in California to
15   Defendants' advertising and promotion of said PRODUCTS. During relevant times, Plaintiff's Decedent
16   used JOHNSON & JOHNSON's and JOHNSON & JOHNSON CONSUMER, INC.'s PRODUCTS within
17   the State of California. During relevant times, Plaintiff's Decedent was exposed to JOHNSON &
18   JOHNSON's and JOHNSON & JOHNSON CONSUMER, INC.'s PRODUCTS within the State of
19   California. At all relevant times, Plaintiff's Decedent was diagnosed in the State of California with injuries
20   caused by Defendants' PRODUCTS. During relevant times, Plaintiff's Decedent was injured and suffered
21   harm as a result of purchasing and using JOHNSON & JOHNSON's and JOHNSON & JOHNSON
22   CONSUMER, INC.'s PRODUCTS within the State of California. During relevant times, Plaintiff's
23   Decedent was injured and suffered harm as a result of relevant actions of Defendants JOHNSON &
24   JOHNSON and JOHNSON & JOHNSON CONSUMER, INC. engaged together with IMERYS TALC
25   AMERICA, INC. in the State of California. During relevant times, Plaintiff's Decedent was injured and
26   suffered harm as a result of conduct by IMERYS TALC AMERICA, INC. in the State of California, for
27   which JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER, INC. are derivatively liable.
28   At all relevant times, Plaintiff's Decedent was treated in the State of California for injuries caused by

1   Defendants' PRODUCTS.

2       4.      Upon information and belief, beginning in 1975, Plaintiff's Decedent purchased the
3   PRODUCTS and used said PRODUCTS on a daily basis in and around her perineal regions through in or
4   about 2002. During this time, while a citizen and resident of the State of California, and a citizen and
5   resident of the County of San Diego, Plaintiff's Decedent purchased the PRODUCTS and used the
6   PRODUCTS by applying the PRODUCTS to her body in accordance with the instructions for use that
7   accompanied the PRODUCTS and in a reasonably foreseeable manner.

8       5.      Upon information and belief, in or about December 2002, Plaintiff's Decedent was
9   diagnosed with ovarian cancer and received medical treatment for ovarian cancer. Plaintiff's Decedent
10  was diagnosed with ovarian cancer, which developed while she resided in the State of California.
11  Plaintiff's Decedent developed ovarian cancer, and ultimately passed away from ovarian cancer, while a
12  citizen and resident of the State of California, as a direct and proximate result of the unreasonably
13  dangerous and defective nature of talcum powder, the main ingredient of the PRODUCTS, and Defendants'
14  wrongful and negligent conduct in the research, development, design, labeling, testing, manufacture,
15  production, promotion, distribution, marketing, and sale of the PRODUCTS.

16      6.      Plaintiff brings this action in accordance with California Code of Civil Procedure section
17  378 as Plaintiff's claims arise out of the same transaction, occurrence, or series of transactions or
18  occurrences and questions of law and fact are common to all of the other plaintiffs that were or may be
19  joined in this case will arise in the action. All claims in this action are a direct and proximate result of the
20  negligent, willful, and wrongful acts and/or omissions of Defendants and/or their corporate predecessors
21  in connection with the design, development, manufacture, testing, packaging, promoting, marketing,
22  distribution, labeling, and/or sale of the PRODUCTS by JOHNSON & JOHNSON and JOHNSON &
23  JOHNSON CONSUMER COMPANIES, INC. known as Johnson & Johnson Baby Powder and Shower to
24  Shower, and the talcum powder product which was mined, extracted, sorted, milled, treated, formulated,
25  processed, packaged, sold, and shipped by IMERYS TALC AMERICA, INC. to JOHNSON & JOHNSON
26  and JOHNSON & JOHNSON CONSUMER COMPANIES, INC. for use in the PRODUCTS and for sale
27  to the public. Plaintiff in this action seeks recovery for damages as a result of ovarian and/or fallopian tube
28  cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 unreasonably dangerous and defective nature of talcum powder, and the attendant effects of developing

2 ovarian and/or fallopian tube cancer. All of the claims in this action involve common legal, common

3 factual, and common medical issues.

4       7.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times

5 Defendant JOHNSON & JOHNSON is a corporation doing business in and authorized to do business in

6 the state of California, and was incorporated in New Jersey in 1887.

7       8.    Plaintiff is informed and believes, and based thereon alleges, that at all relevant times

8 Defendant JOHNSON & JOHNSON maintains an office located at One Johnson & Johnson Plaza, New

9 Brunswick, New Jersey, 08933 as well as several locations within the state of California, and has

10 approximately 127,100 employees worldwide.

11       9.    As stated in JOHNSON & JOHNSON'S Form10-K Annual Report Pursuant to Section 13

12 of the Securities Exchange Act of 1934 for the fiscal year ended January 3, 2016, JOHNSON &

13 JOHNSON'S primary focus is on products related to human health and well-being.

14      10.    Plaintiff is informed and believes, and based thereon alleges that at all relevant times

15 Defendant JOHNSON & JOHNSON'S family of companies includes more than 250 operating companies

16 conducting business in 60 countries of the world and organized into three business segments: Consumer,

17 Pharmaceutical and Medical Devices.

18      11.    Plaintiff is informed and believes, and based thereon alleges that at all relevant times the

19 JOHNSON & JOHNSON family of companies includes 121 manufacturing facilities and, within the United

20 States, eight facilities are used by the Consumer segment.  In addition to the manufacturing facilities,

21 JOHNSON & JOHNSON maintains numerous offices and warehouses in the United States.

22      12.    Plaintiff is informed and believes, and based thereon alleges that at all relevant times the

23 Consumer segment of the JOHNSON & JOHNSON family of companies includes a broad range of over-

24 the-counter products including, but not limited to, Shower to Shower body powder and Johnson &

25 Johnson's Baby Powder.  These products are marketed to the general public and sold both to retail outlets

26 and distributors throughout the world.

27      13.    Plaintiff is informed and believes, and based thereon alleges that at all relevant times,

28 Defendant JOHNSON & JOHNSON has engaged in substantial, continuous economic activity in

California, including marketing, distribution, and sale of billions of dollars in products to Californians including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder, that said activity by Defendant is substantially connected to the Plaintiff's claims as alleged herein.

14.    Plaintiff is informed and believes, and based thereon alleges at all relevant times, Defendant JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., was a New Jersey Corporation doing business in the state of California, a wholly owned subsidiary of JOHNSON & JOHNSON, and engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions dollars in products to Californians including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder, that said activity by Defendant is substantially connected to the Plaintiff's claims as alleged herein.

15.    JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. are hereinafter referred to collectively as the "JOHNSON & JOHNSON" Defendants.

16.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant, IMERYS TALC AMERICA, INC., is a Delaware corporation, with its principal place of business in the state of California. Specifically, IMERYS TALC AMERICA, INC. maintains its Head Office and Laboratory at 1732 North First Street, Suite 450, San Jose, California 95112.

17.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, IMERYS TALC AMERICA, INC., is the successor or continuation of Luzenac America, Inc., and IMERYS TALC AMERICA, INC. (hereinafter "IMERYS") is legally responsible for all liabilities incurred when it was known as Luzenac America, Inc.

18.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant IMERYS has been in the business of mining, extracting, processing, treating, formulating, promoting, selling, and distributing talcum powder for use in talcum powder based products, including the PRODUCTS.

19.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of Defendants Does 1 through 100, inclusive, were unknown to Plaintiff at the time of original filing of the underlying complaint in this action

1    and, therefore sue said Defendants by such fictitious names.

2        20.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the

3    true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 100,

4    inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious

5    names. Plaintiff is informed and believes and based thereon alleges that each of the Defendants designated

6    herein by fictitious names is in some manner legally responsible for the events and happenings herein

7    referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

8        21.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all

9    of said Defendants herein, including the named Defendants, Defendants DOES 1 through 100, inclusive,

10    and the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint are

11    collectively referred to herein as "Defendants" and all acts and omissions of Defendants as alleged herein

12    were undertaken by each of the Defendants or said Defendants agents, servants, employees and/or owners,

13    acting in the course and scope of its respective agencies, services, employments and/or ownerships.

14        22.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all

15    allegations concerning Defendants includes Defendants' parents, subsidiaries, affiliates, divisions,

16    franchises, partners, joint venturers, organizational units of any kind, predecessors, successors and assigns,

17    and their officers, directors, employees, agents, representatives, and any and all other persons acting on

18    behalf of Defendants.

19        23.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times

20    alleged herein, Defendants, and each of them were the agents of each of the other Defendants, and acting

21    within the course and scope of such agency.

22        24.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times,

23    Defendants were engaged in the business of placing the PRODUCTS into the stream of commerce by

24    designing, manufacturing, marketing, packaging, labeling, distributing and/or selling said PRODUCTS to

25    Californians, including Plaintiff herein, and that JOHNSON & JOHNSON and JOHNSON & JOHNSON

26    CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. designed,

27    developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and sold

28    the PRODUCTS to consumers, and IMERYS TALC AMERICA, INC. mined, extracted, sorted, milled,

1  processed, treated, processed, formulated, packaged, sold, and shipped the talcum powder that comprises
2  the PRODUCTS to JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A
3  JOHNSON & JOHNSON CONSUMER COMPANIES, INC. for sale, without substantial change, to the
4  general public worldwide and in the state of California.

5      25.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times,
6  Defendants, designed, developed, tested, patented, manufactured, marketed, advertised, promoted and/or
7  sold the PRODUCTS worldwide and in the state of California.

8      26.    Upon information and belief, Plaintiff's Decedent purchased the PRODUCTS and used said
9  PRODUCTS on a daily basis in and around her perineal regions.  The Decedent further used the
10 PRODUCTS to dust other parts of her body including, but not limited to, her face, under arms and chest in
11 proximity to their breathing zone.  The Decedent further used the PRODUCTS for other household
12 purposes.   The Decedent purchased the PRODUCTS and used the PRODUCTS by applying the
13 PRODUCTS to her body in accordance with the instructions for use that accompanied the PRODUCTS
14 and in a reasonably foreseeable manner.

15     27.    Plaintiff is informed and believes, and based thereon allege that, at all relevant times,
16 Defendants were engaged in the business of placing the PRODUCTS into the stream of commerce by
17 designing, manufacturing, marketing, packaging, labeling, and/or selling said PRODUCTS, and that
18 JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON &
19 JOHNSON CONSUMER COMPANIES, INC. designed, developed, manufactured, tested, packaged,
20 promoted, marketed, advertised, distributed, labeled, and sold the PRODUCTS to consumers and IMERYS
21 TALC AMERICA, INC. mined, extracted, sorted, milled, processed, treated, analyzed, tested, processed,
22 formulated, packaged, sold, and shipped the talcum powder that comprises the PRODUCTS to JOHNSON
23 & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON
24 CONSUMER COMPANIES, INC. for sale, without substantial change, to the general public worldwide
25 and in the state of California.

26     28.    Upon information and belief, Plaintiff's Decedent purchased the PRODUCTS and used the
27 PRODUCTS by applying the PRODUCTS to her body in accordance with the instructions for use that
28 accompanied the PRODUCTS and in a reasonably foreseeable manner.

29.     Upon information and belief, Plaintiff's Decedent developed ovarian cancer, and suffered effects and sequelae therefrom, as a direct and proximate result of the unreasonably dangerous and defective nature of talcum powder, the main ingredient of the PRODUCTS, and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, formulation, processing, packaging, promotion, distribution, marketing, and sale of the PRODUCTS and/ or the talcum powder that comprises the PRODUCTS.

30.     Upon information and belief, as a direct and proximate result of the injuries alleged herein, Plaintiff's Decedent has incurred and will in the future incur both general and special damages as hereinafter alleged.

31.     Plaintiff is informed and believes, and based thereon alleges that, all claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors negligent, willful, and wrongful conduct as follows: Defendants' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, sale, mining, extraction, processing, treatment, formulation, packaging, and distribution of the PRODUCTS.

32.     Plaintiff in this action seeks recovery for damages as a result of ovarian cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of the talcum powder, the main ingredient of the PRODUCTS.

33.     Plaintiff's Decedent developed ovarian cancer, and suffered effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of the PRODUCTS and the talcum powder therein, and Defendants' wrongful and negligent conduct as follows: Defendants' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, sale, mining, extraction, processing, treatment, formulation, packaging, and distribution of the PRODUCTS, and as a direct and proximate result of these injuries, Plaintiff's Decedent has incurred and will incur medical expenses in the future, has endured and will endure pain and suffering, has endured and will endure loss of enjoyment of life, has endured and will endure other general and special damages, and has otherwise been damaged in a personal and pecuniary nature.

34.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, all Defendants were engaged in the research, development, manufacture, design, testing,

1  sale and marketing of PRODUCTS as follows:  Defendants' design, development, manufacture, testing,

2  packaging, promoting, marketing, distribution, labeling, sale, mining, extraction, processing, treatment,

3  formulation, packaging, and distribution of the PRODUCTS, and Defendants introduced said PRODUCTS

4  into interstate commerce with knowledge and intent that such PRODUCTS be sold to consumers in the

5  State of California.

6        35.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times

7  alleged herein, Defendant IMERYS TALC AMERICA, INC. ("IMERYS") was not merely a raw materials

8  supplier. Rather, IMERYS actively designs, develops, and formulates talc for specific uses.

9                        **COMMON FACTUAL ALLEGATIONS**

10       a.    *Introduction to the PRODUCTS*

11       36.    Historically, the PRODUCTS, which include "Johnson's Baby Powder" and "Shower to

12  Shower," have represented freshness, cleanliness, and purity.

13       37.    Upon information and belief, at all relevant times alleged herein, the Defendants JOHNSON

14  & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON

15  CONSUMER COMPANIES, INC. advertised and marketed "Johnson's Baby Powder" as the beacon of

16  "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" helping keep skin

17  feeling dry and comfortable, and "clinically proven gentle and mild". The Defendants JOHNSON &

18  JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON

19  CONSUMER COMPANIES, INC. compelled women through advertisements to dust themselves with this

20  product to mask odors. The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For

21  you, use every day to help feel soft, fresh, and comfortable."

22       38.    Upon information and belief, at all relevant times alleged herein, Defendants JOHNSON &

23  JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON

24  CONSUMER COMPANIES, INC. advertised and marketed the product "Shower to Shower" as safe for

25  use by women, as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisements

26  such as, "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to

27  feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over

28  your body."

39.     Plaintiff herein used the PRODUCTS to dust her perineum for feminine hygiene purposes. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

40.     Upon information and belief, the PRODUCTS are composed almost entirely of magnesium trisilicate, also known as talc. Talc is an inorganic mineral that is mined from the earth.

41.     Upon information and belief, at all relevant times, IMERYS supplied its customers, including JOHNSON & JOHNSON, with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to customers.

42.     Upon information and belief, since as early as the 1970s, IMERYS and JOHNSON & JOHNSON have been on notice of an association between talc exposure and ovarian cancer, as discussed more fully below.

43.     Upon information and belief, since the 1970s, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. have nonetheless continually advertised and marketed the PRODUCTS as safe for human use, and IMERYS TALC AMERICA, INC. has marketed and promoted talcum powder, the main ingredient of the PRODUCTS, as safe for human use. Upon information and belief, JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. decided to downgrade the quality of the talc product supplied by IMERYS and informed IMERYS to supply a downgraded version of the talc product to use in its PRODUCT in order to reduce costs and increase profits for JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.

44.     At all relevant times alleged herein, a feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness.

/ / /

/ / /

/ / /

**b.**   *Timeline of the Scientific Literature Analyzing the Relationship Between Talc and Ovarian Cancer*

45.   Research published as early as 1961 has established that particles, like talc, can translocate from the exterior genital area to the ovaries in women. See G.E. Egli, and Michael Newton, The Transport of Carbon Particles in the Human Female Reproductive Tract, 12 FERTILITY STERILITY 2, 151-155 (1961).

46.   Due to talc's potential for transmission, researchers remained concerned about its carcinogenic nature and the effects of use. In 1968, a study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 2 9 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968). A 1976 follow-up study concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J TOXICOL ENVIRON HEALTH 255-284 (1976).

47.   In 1971, the first study was published that suggested an association between talc and ovarian cancer. This study was published by W. J. Henderson in Cardiff, Wales at the Tenovus Institute. The study found talc particles "deeply embedded" in ten of thirteen ovarian tumors, twelve of twenty-one cervical tumors, one primary carcinoma of the endometrium and five of twelve "normal" ovaries from women with breast cancer. W. J. Henderson et al., *Talc and carcinoma of the ovary and cervix*, 78 J. OBSTET. GYNAECOL. BR. COMMW. 3, 266-272 (1971).

48.   In 1982, the first epidemiologic study was published on talc powder use in the female genital area. This study was published by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Additionally, it found that talc application

1  directly to the genital area around the time of ovulation might lead to talc particles becoming deeply
2  imbedded in the tissues of the ovary, and perhaps causing foreign body reaction capable of causing
3  growth of epithelial ovarian tissue. This study showed an epidemiologic association between the use of
4  cosmetic talc in genital hygiene and ovarian cancer. Daniel Cramer et al., *Ovarian cancer and talc:*
5  *a case control study*, 50 CANCER 372-376 (1982).

6      49.    Since 1982, there have been approximately twenty-two (22) additional epidemiologic
7  studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have
8  reported an elevated risk for ovarian cancer associated with genital talc use in women:

9      •   In 1983, Patricia Hartage and Robert Hoover of the National Cancer Institute and Linda Lester
10          and Larry McGowan of the George Washington University Medical Center, published a case-
11          control interview study regarding ovarian cancer. Although no association was proven due to
12          the small sample size, the study found an "excess relative risk" of 2.5 (95% CI=0.7 to 10.0) of
13          ovarian cancer for women who use talc in the genital area. Patricia Hartage et al., *Talc and*
14          *ovarian    cancer*,    250    JAMA    1844    (1983)    *available    at*
15          http://jamanetwork.com/journals/jama/article-abstract/1725023.

16     •   In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539
17          controls found that 52% of the cancer patients habitually used talc on the perineum before their
18          cancer diagnosis. The study showed that women using talc daily on their perineum had 1.45
19          times the risk of ovarian cancer then women that did not use talc daily, showing a positive dose-
20          response relationship. Alice Whittemore et al., *Personal and environmental characteristics*
21          *related to epithelial ovarian cancer.  II. Exposures talcum powder, tobacco, alcohol, and*
22          *coffee*, 1 2 8  AM. J. EPIDEMIOL. 6, 1228-1240 (1988).

23     •   A case control study conducted in 1989 found similar results. The study looked at 235 women
24          diagnosed with epithelial ovarian cancer and 451 controls and found an increased risk in ovarian
25          cancer with women who reported genital talc powder use more than once per week. Margaret
26          Booth et al., *Risk factors for ovarian cancer: a case-control study*, 60 BR. J. CANCER 4, 592-
27          598 (1989).

28  / / /

- Another case control study conducted in 1989 by Bernard Harlow of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing, and a statistically significant increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum. This study also found a positive dose-response relationship. Bernard Harlow and Neinke Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, 130 AM. J. EPIDEMIOL. 2, 390-394 (1989).

- A 1992 study, also by Dr. Harlow, found that frequent and long-term talc use directly on the genital area during ovulation increased a woman's risk of ovarian cancer threefold. The study also found "[t]he most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals). Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." This study looked at 235 ovarian cancer cases compared to 239 controls, concluding that "given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk*, 80 OBSTET. GYNECOL. 1, 19-26 (1992).

- Also in 1992, a case-control study was conducted by Karin Rosenblatt at the Department of Epidemiology of John's Hopkins School of Hygiene and Public Health. This study showed that the development of ovarian cancer may be associated with genital fiber exposure (especially talc on sanitary napkins), and a relative risk of 4.8 for ovarian cancer development from talc use on sanitary napkins. Karen Rosenblatt et al., *Mineral fiber exposure and the development of ovarian cancer*, 45 GYNECOL. ONCOL. 20-25 (1992).

- Another 1992 case-control study conducted by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, 21 INT. J. EPIDEMIOL. 23-29 (1992).

13

- In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats." Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No. 421 (September 1993).

- In 1995, a case control study conducted in Australia by David Purdie, involving over 1600 women found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum. David Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study*, 62 INT. J. CANCER 6, 678-684 (1995).

- In 1996, a case-control study similarly found a statistically significant increased risk of ovarian cancer in women who used talc-based powders in their genital area. *See* Asher Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 FERTIL. STERIL. 1, 13-18 (1995).

- In 1996, the condom industry stopped coating condoms with talc due to the health concerns of ovarian cancer, "[c]oncern about talc as an ovarian carcinogen goes back 50 years in the medical literature. By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer." Marie McCullough, *Women's health concerns prompt condom makers to stop using talc*, Jersey Journal (City Ed.) (Jan. 10, 1996).

- In 1997, a case-control study of 313 women with ovarian cancer and 422 controls found that the women with cancer were more likely to have applied talc powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Linda Cook et al., *Perineal powder exposure and the risk of ovarian cance*r, 145 AM. J. EPIDEMIOL. 459-465 (1997).

///

14

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

- In 1997, a case-control study conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine, which included over 1,000 women found a statistically significant increased risk for ovarian cancer for women who applied talc via sanitary napkins to their perineum. The study indicated that "[c]ommercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc. When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found," concluding "[t]he results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated." Stella Chang and Harvey Risch, *Perineal talc exposure and risk of ovarian carcinoma*, 79 CANCER 12, 2396-2401 (1997).

- A 1998 case-control study conducted in Canada by Beatrice Godard found increased risk of ovarian cancer in women who used talc-based powders on their perineum. Beatrice Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*, 179 AM. J. OBSTET. GYNECOL. 2, 403-410 (1998).

- In 1999, Dr. Cramer conducted a case-control study of 563 women newly diagnosed with epithelial ovarian cancer and 523 controls. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum: "[w]e conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute ("NCI"). Daniel Cramer et al., *Genital talc exposure and risk of ovarian cancer*, 81 INT. J. CANCER 3, 351-356 (1999).

- In 2000, Roberta Ness, from University of Pennsylvania, led a case control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation, and that inflammation contributes to cancer cell development. Roberta Ness et al., *Factors Related to*

15

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

*Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 EPIDEMIOLOGY 2, 111-117 (2000).

- Also in 2000, a prospective cohort study found a 40% increase in invasive serous cancers in women who applied talc to their perineum. Dorota Getrig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. NATL. CANCER INST. 3, 249-252 (2000).

- In 2003, a meta-analysis was conducted which re-analyzed data from 16 studies published prior to 2003, finding a 33% increase in ovarian cancer risk among talc users. Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: A meta-analysis of 11,933 subjects from sixteen observational studies*, 23 ANTICANCER RES. 2C, 1955-60 (2003).

- In 2004, a case-control study of nearly 1400 women from twenty-two counties was performed in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use, compared with women using cornstarch powders as "[c]ornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded that "users should exercise prudence in reducing or eliminating use," and "the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures, talcum powder use is easily avoidable." Paul Mills et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 INT. J. CANCER 458-64 (2004).

- In 2008, Margaret Gates performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study (the "Gates Study"). This study was funded by NCI, and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use. A 60% increased risk of the serous invasive subtype was also found. Dr. Gates noted a pronounced and positive dose-response relationship, increasing risk with increasing talc usage by women. These results "provide additional support

for a main effect of genital talc exposure on epithelial ovarian cancer . . . the finding of highly significant trends between increasing frequency of use and risk 'strengthen[ing] the evidence of an association, because most previous studies have not observed a dose response.'" Notably, the study promoted an alternative to talc, cornstarch, which "has not been shown to increase ovarian cancer risk . . . " The study concluded that "women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk. Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped." Margaret Gates et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 CANCER EPIDEMIOL, BIO. & PREV. 9, 2436-2444 (2008).

- In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society commented on the Gates Study. He stated the dose-response relationship between talc and ovarian cancer had finally been confirmed by this study: "[T]here are very few modifiable risk factors for ovarian cancer. The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation." Zosia Chustecka and Desiree Lie, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (Oct. 8, 2008) *available at* http://www.medscape.com/viewarticle/581781.

- In 2008, Melissa Merritt, from the Australian Cancer Study and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women finding a statistically significant increased risk of ovarian cancer for women who used talc on their perineum was confirmed. This study also confirmed a statistically significant increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum. Melissa Merritt et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 INT. J. CANCER 1, 170-176 (2008).

- In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with frequency and duration of talc use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use. In conclusion the study stated, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Anna Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 INT. J. CANCER 6, 1409-1415 (2009).

- In 2015, Anna Wu looked at the risk factors for invasive epithelial ovarian cancer among Hispanics and African Americans. The study used multivariate logistic regression to examine parity, oral contraceptive use, tubal ligation, endometriosis, family history of ovarian cancer, and talc use and risk of ovarian cancer among Hispanics, African Americans and non-Hispanic Whites using four case control-studies conducted in Los Angeles County. The study found a statistically significant increased risk for ovarian cancer for Non-Hispanics whites of 41% and an additional 14% for every five years of talc use, an increased risk for Hispanics of 77% and an additional 18% for every five years of talc use, and an increased risk for African Americans of 56% and a 15% additional increase for every five years of talc use. Anna Wu et al., *African Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic Whites after considering non-genetic risk actors and oophorectomy rates,* CANCER EPIDEMIOL BIOMARKERS PREV July; 24(7): 1094-1100 (2015).

- Various meta-analyses conducted have found positive associations between the use of talc in the genital area and ovarian cancer. *See generally* Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk*, 80 OBSTET. GYNECOL. 1, 19-26 (1992); Andrew Gross, *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer*, 5 J. EXPO. ANAL. ENVIRON. EPIDEMIOL. 2, 181-195 (1995); Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies*, 23 ANTICANCER RES. 1955-60 (2003).

c. *Knowledge of the Connection Between Talc Usage and Ovarian Cancer within the Government, within the Medical Community, and within the Defendant Companies*

50. Upon information and belief, in 1975, JOHNSON & JOHNSON was aware of Henderson, *et al.'s* Tenovus data suggesting an association between talc and ovarian cancer, and was thereby on notice of the association as early as the mid-1970s. JOHNSON & JOHNSON sent a donation to the Cardiff Scientific Society in order to obtain information concerning research being conducted Tenovus Institute and JOHNSON & JOHNSON admitted that it was on notice of the talc and ovarian cancer problem.

51. Upon information and belief, shortly after Dr. Cramer's 1982 study was published, Dr. Semple visited with Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that JOHNSON & JOHNSON should place a warning on its talcum powder PRODUCTS concerning ovarian cancer risks so that women could make an informed decision about their health.

52. Upon information and belief, on August 12, 1982, JOHNSON & JOHNSON publicly recognized the studies linking the use of the PRODUCTS to ovarian cancer. In a New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," the company admitted to being aware of the 1982 Cramer article that concluded women who apply talc daily to their genital areas were three times more likely to contract ovarian cancer.

53. Upon information and belief, JOHNSON & JOHNSON recognized that the safety of cosmetic powders was a concern in a May 1986 Technological Forecast. JOHNSON & JOHNSON recognized that the safety of cosmetic powders was a concern, especially among health professionals, that studies have implicated talc use in the vaginal area with incidents of ovarian cancer and that Johnson's Baby Powder sales were declining along with the overall cosmetic powders market in a classic mature model curve." Upon information and belief, JOHNSON & JOHNSON in approximately 1992 was looking for "opportunities to grow" the Baby Powder franchise despite the fact that the same internal document cited cancer linkage as a "major obstacle" and recommended implementing a plan to market to Hispanic and African American's by launching an adult Hispanic media program and potentially launching an adult black print effort.

54. In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a

1  carcinogen, with or without the presence of asbestos-like fibers.

2      55.    Upon information and belief, on November 10, 1994, the Cancer Prevention Coalition
3  mailed a letter to then JOHNSON & JOHNSON C.B.O, Ralph Larson, informing the company that studies
4  as far back as 1960's "show conclusively that the frequent use of talcum powder in the genital area pose a
5  serious health risk of ovarian cancer." Upon information and belief, the letter cited a recent study from Dr.
6  Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow
7  and his colleagues discouraged the use of talc in the female genital area. Upon information and belief, the
8  letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very
9  difficult to detect and has a low survival rate. Upon information and belief, the letter concluded by
10 requesting that JOHNSON & JOHNSON withdraw talc products from the market, or at a minimum, place
11 warning information on its talc-based products disclosing the risk of ovarian cancer.

12     56.    Upon information and belief, on September 17, 1997, JOHNSON & JOHNSON was
13 notified that on three separate occasions the CTFA (as an agent of Defendants) had released false
14 information to the public about the safety of talc, that studies had shown a statistically significant
15 association between hygienic talc use and ovarian cancer, and that anybody who denies this risks that the
16 talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in
17 the face of all evidence to the contrary.

18     57.    Upon information and belief, in 1998 IMERYS wanted to stop discussions about ovarian
19 cancer in order to free the development in cosmetic applications, avoid the initiation of a process for
20 classification of talc as a carcinogen, and implement a plan to discredit research and scientists.

21     58.    Upon information and belief, on January 30, 2000, IMERYS was on notice of the National
22 Toxicology Program ("NTP") listing nomination of non-asbestiform talc as carcinogenic and votes in favor
23 of such listing, and acknowledged that the reviewers found that the epidemiology studies associating talc
24 and ovarian cancer providing convincing evidence of talc carcinogenicity in humans.

25     59.    Upon information and belief, as of September 12, 2000, Luzenac was specifically aware,
26 knew, and acknowledged that the general public was not aware of any health issues regarding talc.

27     60.    Upon information and belief, as of October 13, 2000, Luzenac was specifically aware, knew,
28 and explicitly acknowledged that that the company would ultimately be held responsible for placing a

harmful product into the stream of commerce.

61.    Upon information and belief, in this letter the CTFA admitted that talc was "toxic," that "some talc particles… can reach the human ovaries," and acknowledged prior epidemiologic studies have concluded that talc increases the risk of ovarian cancer in women.

62.    Upon information and belief, internal reports in 2002, indicated that Luzenac may be asked when the company first learned of the possible association of talc with ovarian cancer, when it began to warn of this risk, and whether company felt a moral and ethical obligation to inform women that the hygienic use of talc may increase their risk for ovarian cancer, or were the company's profits from mining and selling this potentially dangerous, life-threatening product more important than protecting the health and welfare of the women and children in our society.

63.    Upon information and belief, Luzenac considered implementing warnings, including a warning label would warn the consumers the product is not to be used for genital dusting and would report of the possible association between genital dusting and ovarian cancer.

64.    In February of 2006, IARC published a paper whereby they classified perineal use of talc based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

65.    In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

66.    Upon information and belief, in 2006, IMERYS began placing a warning on the Material Safety Data Sheets (MSDS) it provided to JOHNSON & JOHNSON in conjunction with the talc product

1   it sold to them to be used in the PRODUCTS. These MSDSs provided the warning information about the

2   IARC classification, warning information regarding "States Rights to Know," and warning information

3   about the Canadian Government's "D2A" talc classification.

4       67.     Upon information and belief, in 2006 Luzenac was on notice of the potential for product

5   liability litigation against the talc producers for failing to warn of the health risks associated with Talc use.

6       68.     Upon information and belief, in spite of the mounting evidence pointing to the

7   carcinogenicity of the PRODUCTS, particularly when used in the perineal region, from 2008 through 2009

8   JOHNSON & JOHNSON admitted that its marketing was targeting use of JOHNSON & JOHNSON'S

9   baby powder for obese women.

10          **d.      *Defendants Failed to Warn Consumers of the Dangers of Talc Use***

11      69.     At all times herein mentioned, Defendants  had a duty to know and warn about the hazards

12   associated with the use of the PRODUCTS.

13      70.     Upon information and belief, at all times herein mentioned, despite the mounting scientific

14   and medical evidence regarding talc use and ovarian cancer development over the past several decades,

15   none of the warnings on product labels or in other marketing informed users, or similarly situated

16   individuals, that use of the PRODUCTS in the genital area could lead to an increased risk of ovarian cancer.

17   For example, the only warnings on the Baby Powder label are to "[k]eep powder away from child's face

18   to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label

19   also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." JOHNSON

20   & JOHNSON provides similar warnings on their website: "[f]or external use only. Keep out of reach of

21   children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away

22   from child's face to avoid inhalation, which can cause breathing problems."

23      71.     Upon information and belief, at all times herein mentioned, JOHNSON & JOHNSON

24   continues to represent on the labeling and in their marketing that Johnson's Baby Powder has "clinically

25   proven mildness," is "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is

26   supported by decades of scientific evidence and independent peer reviewed studies."

27      72.     Upon information and belief, at all times herein mentioned, Defendants failed to inform

28   customers and end users of the PRODUCTS of a known catastrophic health hazard associated with their

1  use.

2  73.  Upon information and belief, at all times herein mentioned, Defendants procured and

3  disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the

4  public and used influence over governmental and regulatory bodies regarding talc.

5  74.  Upon information and belief, as a direct and proximate result of Defendants' calculated and

6  reprehensible conduct, Plaintiff's Decedent suffered catastrophic injuries and damages, namely ovarian

7  cancer, which required surgeries and treatments.

8  **e.  *Defendant IMERYS Failed to Warn Consumers of the Dangers of Talc Use***

9  75.  On information and belief, at all relevant times alleged herein, Defendant IMERYS TALC

10  AMERICA, INC., mined, manufactured and sold talc to JOHNSON & JOHNSON and JOHNSON &

11  JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. for

12  sale to the public.

13  76.  At all times herein mentioned, the talcum powder mined, extracted, sorted, milled,

14  processed, treated, formulated, packaged, shipped, supplied, sold, marketed and distributed by IMERYS

15  to JOHNSON & JOHNSON for sale to the public was inherently and extremely dangerous in that, as set

16  forth in detail above, it causes cancer in humans.

17  77.  On information and belief, at all relevant times alleged herein, JOHNSON & JOHNSON

18  and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER

19  COMPANIES, INC. then packaged and sold said talc in the PRODUCTS they sold to consumers, and

20  IMERYS knew that consumers of the PRODUCTS were using it to powder their perineal regions.

21  78.  On information and belief, the PRODUCTS had potential risk and side effects that were

22  known or knowable in light of the scientific and medical knowledge that was generally accepted in the

23  scientific community at the time of the manufacture, distribution and sale.

24  79.  On information and belief, the potential risks and side effects presented a substantial danger

25  when the PRODUCTS were used or misused in an intended or reasonably foreseeable way.

26  80.  On information and belief, ordinary consumers would not have recognized the potential

27  risks and side effects described herein.

28  / / /

81.     Upon information and belief, IMERYS actively participated in the design, development, and formulation of the PRODUCTS. IMERYS is the world's largest talc producer and engages in the development, formulation, treatment, and promotion of talc for specific use in the PRODUCTS. IMERYS has represented publicly that:

- IMERYS spearheads talc milling technology, a complex process where the methods used depend both on the ore type and the final application. To obtain exactly the right particle size and top cut for a given application, we use a variety of techniques including compressed air, steam and impact milling - many of which have been developed in-house. Median particle sizes can range from less than 1 micron to 15 microns, and top cuts from 6 microns to over 100 microns.

- IMERYS implements specific treatments to the talc used in the PRODUCTS by milling, sorting, heating, grinding, and works directly with JOHNSON & JOHNSON on formulations ("…applications specialists work directly with customers on their formulations.")

  http://www.imerystalc.com/content/corporate/AboutImerysTalc/Expertise_and_quality/Expertise/index.php

- IMERYS uses sorting and milling technologies to process talc, laser and image analysis technology, friction sorting, flotation techniques, drying, crushing grounding and micronizing;

- IMERYS specifically promotes its talc for use in body powders and engineers its processing so that the Talc retain perfume ("…surfaces of the talc platelets retain the perfume with the minimum loss of potency.")

- IMERYS employs end-market specialists to pilot each market sector to match right talc to the right application and leads its products to new innovations….

- IMERYS employs experts from the specialist markets it serves and provides technical expertise, collaborating on research projects, and supports JOHNSON & JOHNSON in its product development and marketing efforts;

- Working at our technical centers in San José and Toulouse, our R&A teams focus on finding new applications for talc and new formulations to improve existing applications; formulation studies for customers; and fundamental research.

- IMERYS works with JOHNSON & JOHNSON to develop new process technologies for its products;

- IMERYS collaborates JOHNSON & JOHNSON on research to find new applications for its products;

- IMERYS employs teams to find new applications for talc, conducts formulation studies for customers, and conducts fundamental research concerning Talc.

82.    Plaintiff is informed and believes, and based thereon alleges that at all times herein mentioned, IMERYS failed to adequately warn that its talcum powder PRODUCTS presented substantial dangers and risks, which would not have been recognized by ordinary consumers when used in an intended or reasonably foreseeable way, as evidenced through the following conduct:

- Through its mining, extraction, sorting, milling, processing, treating, formulating, packaging and manufacture of the talcum powder that comprises the PRODUCTS, IMERYS had a significant role in creating the finished PRODUCTS, and did not actually or reasonably rely on JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. to convey warnings to end users, and any such reliance would have been unjustified.

- IMERYS did not take the additional steps it should have, including inquiring about JOHNSON & JOHNSON'S and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC.'s warning practices, to ensure that warnings were communicated to consumers.

- IMERYS ignored known facts that would provide notice of a substantial risk that JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. might fail to warn consumers of the risks of talcum powder exposure, and those warnings might fail to reach consumers.

- IMERYS knew there was a substantial likelihood that JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. would not convey the necessary or adequate warnings or information to ultimate consumers of talc PRODUCTS.

- IMERYS knew JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. were not conveying such warnings or information to consumers, and that said Defendants' economic motivations were such that they had an incentive to withhold necessary information about talcum powder because warnings would make the products containing talc less attractive to consumers.

83. Plaintiff is informed and believes, and based thereon alleges that at all times herein mentioned, IMERYS could and should have shared its superior knowledge and information about the dangers involved in the use of the talcum powder with JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., and could and should have warned said Defendants and the public of the risks of harm.

84. According to IMERYS'S website (http://www.imerystalc.com/) talc is used in agriculture, ceramics, cosmetics, food, paints and coatings, paper, pharmaceuticals, plastics, and rubber products, and for each broad category of applications IMERYS manufactures and markets talc products with unique features, formulations and physical properties which are designed for specific uses within those categories. IMERYS'S subjective plan of milling, treating and formulating its Talc products for use in JOHNSON & JOHNSON PRODUCTS constitutes a design. The Talc product produced by IMERYS is of common experience, encountered generally in everyday life, and a product on which a jury can rely on its own expectations of safety, and it failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

85. The talc product sold by IMERYS is inherently dangerous for perineal application, is not substantially changed during the manufacturing of the finished products sold by JOHNSON & JOHNSON to consumers, and IMERYS had more than a limited role in creating the finished product and the PRODUCTS. IMERYS did not have to guess or speculate about the type of use to which its Talc product would be put, but rather IMERYS was aware of and intended that the Talc product supplied would be used in the manner in which it was actually used. The Talc products supplied by IMERYS were specifically designed to meet the needs of JOHNSON & JOHNSON.

86. The talc product designed and sold by IMERYS is itself harmful and, without change in its composition, remains so when incorporated into the PRODUCTS and, renders the PRODUCTS into which

1   it is incorporated harmful, contrary to ordinary consumer expectations. JOHNSON & JOHNSON did not

2   significantly alter the IMERYS Talc product. It is not just a design defect in the manufactured end product

3   that caused the injury, but the defective nature of the IMERYS Talc product contained in the PRODUCTS.

4       87.    Upon information and belief, at all times herein mentioned, the talcum powder mined,

5   extracted, sorted, milled, processed, treated, formulated, packaged, shipped, supplied, sold, marketed and

6   distributed by IMERYS to JOHNSON & JOHNSON for sale to the public was not substantially changed

7   during the manufacturing of the finished PRODUCTS, and Imerys had a significant role in creating the

8   finished PRODUCTS.

9       88.    Upon information and belief, IMERYS actively participated in the design, development,

10  and formulation of the PRODUCTS. Specifically, as stated on IMERYS'S website www.imerystalc.com,

11  IMERYS is the world's largest talc producer and represents on its website the following:

12          **From mine to market**

13            **Sorting**

14            Sorting the different talc ores according to their talc content and brightness is a key

15            phase of the production process. Techniques include state-of-the-art laser and image

16            analysis technology, friction sorting or flotation techniques. The ores are then dried,

17            crushed, ground and micronized.

18

19  ## From mine to market



20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**Milling**

Imerys spearheads talc milling technology, **a complex process** where the methods used depend both on the ore type and the final application. To obtain exactly the right particle size and top cut for a given application, we use a variety of techniques including compressed air, steam and impact milling - many of which have been developed in-house. Median particle sizes can range from less than 1 micron to 15 microns, and top cuts from 6 microns to over 100 microns.

# From mine to market




**Milling**

Imerys spearheads talc milling technology, a complex process where the methods used depend both on the ore type and the final application. To obtain exactly the right particle size and top cut for a given application, we use a variety of techniques including compressed air, steam and impact milling - many of which have been developed in-house. Median particle sizes can range from less than 1 micron to 15 microns, and top cuts from 6 microns to over 100 microns.

**Treated talcs**

Certain grades of talc are treated, e.g. amine-coated talcs for fertilizers; silane-coated talcs for the rubber industry; and cationic talcs for pitch control in papermaking. For the cosmetics and pharmaceuticals industries, talcs are heat-treated to decontaminate them.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL



About talc  **Extraction and processing**

## From mine to market




▶ Overburden removal
▶ Talc extraction
▶ Sorting
▶ Milling
     **Treated talcs ▶**
▶ Packaging
▶ Shipping

**Treated talcs**

Certain grades of talc are treated, e.g. amine-coated talcs for fertilizers; silane-coated talcs for the rubber industry; and cationic talcs for pitch control in papermaking. For the cosmetics and pharmaceuticals industries, talcs are heat-treated to decontaminate them.

http://www.imerystalc.com/content/corporate/About_talc/Extraction_and_processing/

### Formulating for our customers

Our applications specialists work directly with customers on their formulations. Existing formulations are improved and rendered more cost-effective, or replaced by more advanced solutions. Every year, we carry out more than a hundred formulation studies at our research and development facilities in Denver and Toulouse and help customers achieve their performance objectives while saving them valuable time.

**Formulating for our customers**

Our applications specialists work directly with customers on their formulations. Existing formulations are improved and rendered more cost-effective, or replaced by more advanced solutions. Every year, we carry out more than a hundred formulation studies at our research and development facilities in Denver and Toulouse and help customers achieve their performance objectives while saving them valuable time.

http://www.imerystalc.com/content/corporate/About-ImerysTalc/Expertise_and_quality/Expertise/index.php

### Body powders & Creams

Imerys talcs make excellent body powders and fragrance carriers for scented powders...

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**Baby and Body Powders**

With their soft, silky feel, Imerys talcs make excellent body powder. Applied after bathing, talc dries the skin, preventing chafing, and gives a pleasant, soothing, cool sensation.

Imerys talcs are excellent fragrance carriers for scented body powders. The surfaces of the talc platelets retain the perfume with the minimum loss of potency.

http://www.imerystalc.com/content/bu/Cosmetics/Applications/Body_powder_&_creams/america.php



**A team of experts at your service**

Good understanding of each market segment is vital to matching the right talc to the right application.

At Imerys Talc, we have end-market specialists on board who pilot each market sector, leading the way with new innovations….

Working at state of the art R&D facilities and pilot plants in the United States, Europe, and Asia Pacific, our experts – many of whom have been recruited from the specialist markets we serve – are dedicated to:

- providing technical expertise and collaborating on research projects to support our customers,

- developing new process technology to increase efficiency and product quality,

- collaborating on research to improve products and find new applications.

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# A team of experts at your service

The world relies on our minerals, and we rely on one of our most important resources in finding, mining, processing and delivering them - our people.

Working at state-of-the-art R&D facilities and pilot plants in the United States, Europe, and Asia Pacific, our experts - many of whom have been recruited from the specialist markets we serve - are dedicated to:

- providing technical expertise and collaborating on research projects to support our customers,
- developing new process technology to increase efficiency and product quality,
- collaborating on research to improve products and find new applications.

**Good understanding of each market segment is vital to matching the right talc to the right application.**

**At Imerys Talc, we have end-market specialists on board who pilot each market sector, leading the way with new innovations.**



http://www.imerystalc.com/content/corporate/About-Imerys-Talc/Expertise_and_quality/Expertise/index.php

89.     Upon information and belief, at all times herein mentioned, IMERYS did not actually or reasonably rely on JOHNSON & JOHNSON to convey warnings to end users, and any such reliance would have been unjustified.

90.     Because of the gravity of the risks posed by the talc involved and the severity of the harm to consumers, and because of its unique and sophisticated knowledge of the dangers inherent in its talcum powder, IMERYS could and should have taken additional steps, such as inquiring about JOHNSON & JOHNSON'S warning practices, to ensure that warnings were communicated to consumers.

91.     Upon information and belief, at all times herein mentioned, IMERYS had the legal right to issue notices regarding the safe use of JOHNSON & JOHNSON'S talc products, including end uses of the products.  Upon information and belief, at all times herein mentioned, IMERYS also had the legal right to refuse to sell talc to JOHNSON & JOHNSON, if JOHNSON & JOHNSON'S use was improper, unsafe or unlawful.

92.     Upon information and belief, however, for twenty-five years, IMERYS disregarded the facts and evidence it had compiled internally regarding the carcinogenicity of talc, as detailed herein, and never exercised its right to refuse to sell talcum powder to the JOHNSON & JOHNSON Defendants.

93.     Upon information and belief, in 2006, when IMERYS added a warning to its talcum powder label, the company still never required JOHNSON & JOHNSON to convey the same or a substantially similar warning to end users of the product, even though IMERYS knew there was a substantial likelihood

31

that JOHNSON & JOHNSON would not convey the necessary or adequate warnings or information to ultimate consumers of talc, and even though it knew in 2006, as discussed herein, of the potential for talc producers to be liable in product liability litigation in the United States.

94. Upon information and belief, at all times herein mentioned, IMERYS knew for a fact that JOHNSON & JOHNSON was not conveying such warnings or information to consumers, and that said Defendants' economic motivations were such that they had an incentive to withhold necessary information about talcum powder because warnings would make products containing talc less attractive to consumers.

95. Upon information and belief, at all times herein mentioned, IMERYS could and should have shared its superior knowledge and information about the dangers involved in the use of the talcum powder with JOHNSON & JOHNSON and could and should have warned said Defendants and the public of the risks of harm.

96. At all times herein mentioned, IMERYS failed to adequately warn that its talcum powder products presented substantial dangers and risks, which would not have been recognized by ordinary consumers, when used in an intended or reasonably foreseeable way.

97. As a direct and proximate result of IMERYS' calculated and reprehensible conduct, Plaintiff's Decedent suffered catastrophic injuries and damages, namely ovarian cancer, which required surgeries and treatments.

**f.** ***JOHNSON & JOHNSON and IMERYS Conspired to Conceal the Dangers of Talc***

98. Upon information and belief, the JOHNSON & JOHNSON Defendants and IMERYS and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves, in the State of California, to cause injuries, diseases, and/or illnesses by exposing consumers and Plaintiff's Decedent to the harmful and dangerous PRODUCTS. JOHNSON & JOHNSON and IMERYS knowingly agreed, contrived, confederated and conspired to deprive Plaintiff's Decedent of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose themselves to the dangers associated with them. JOHNSON & JOHNSON and IMERYS committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of the talcum powder contained within the PRODUCTS.

///

1   99. Upon information and belief, in furtherance of said conspiracies, for decades JOHNSON

2 & JOHNSON and IMERYS individually, jointly, and in conspiracy with each other, have been in

3 possession of medical and scientific data, literature and test reports which clearly indicated that

4 ordinary and foreseeable use of their PRODUCTS by women is unreasonably dangerous, hazardous,

5 deleterious to human health, carcinogenic, and potentially deadly.

6   100. Upon information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON

7 and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and

8 available to said Defendants, individually, jointly, and in conspiracy with each other, wrongfully,

9 fraudulently, willfully and maliciously agreed among themselves to withhold, conceal and suppress

10 medical information regarding the increased risk of ovarian cancer, as set out hereinabove. Upon

11 information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON and IMERYS, despite

12 the medical and scientific data, literature, and test reports possessed by and available to said Defendants,

13 individually, jointly, and in conspiracy with each other, caused to be released, published and

14 disseminated medical and scientific data, literature, and test reports containing information and

15 statements regarding the risks of ovarian cancer which JOHNSON & JOHNSON and IMERYS knew

16 were incorrect, incomplete, outdated, and misleading. Upon information and belief, specifically, through

17 the CTFA, JOHNSON & JOHNSON and IMERYS collectively agreed to release false information to the

18 public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. Upon information

19 and belief, in a letter dated September 17, 1997, JOHNSON & JOHNSON and IMERYS were criticized

20 by their own toxicologist consultant for releasing this false information to the public, as stated hereinabove,

21 yet nothing was done by JOHNSON & JOHNSON and IMERYS to correct or redact this public release of

22 knowingly false information.

23   101. Upon information and belief, in furtherance of said conspiracies, JOHNSON & JOHNSON

24 and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and

25 available to said Defendants, individually, jointly, and in conspiracy with each other, by these false

26 and fraudulent representations, omissions, and concealments, intended to induce Plaintiff's Decedent and

27 others to rely upon false and fraudulent representations, omissions and concealments, and to continue

28 to expose themselves to the dangers inherent in the use and exposure to the PRODUCTS.

1   102. Upon information and belief, individually and in concert with each other, JOHNSON &

2 JOHNSON and IMERYS participated in a common plan to commit the torts alleged herein, and each acted

3 tortiously in pursuance of the common plan to protect and promote the health and safety of talc use, to the

4 known detriment of the public, including Plaintiff's Decedent.

5   103. Plaintiff's Decedent reasonably and in good faith relied upon false representations,

6 omissions, and concealments made by JOHNSON & JOHNSON and IMERYS regarding the nature of

7 the PRODUCTS, and as a result suffered the injuries and damages alleged herein.

8   104. Defendants conspired and entered into the aforementioned agreements in the State of

9 California, and engaged in the aforementioned acts in furtherance of their conspiracy and agreements

10 together with each other in California, and as a result of the foregoing conduct in furtherance of their

11 conspiracy and agreements, each of the Defendants is derivatively liable for the conduct of the others in

12 California.

13   105. As alleged in this Complaint, the term "talcum powder products" or "PRODUCTS" refers

14 to Johnson & Johnson's Baby Powder and Shower to Shower products and all constituent elements of those

15 products, including talc, asbestos, fibrous talc, Cadmium, Cobalt, Chromium, Copper, Iron, Manganese,

16 Nickel, and other constituent and related elements and fibers contained within."

17   **g.** *Defendants concealed and failed to warn about the dangers posed by asbestos in the*

18    *talcum powder products*

19   106. Plaintiff alleges that the talcum powder products mined, milled, imported, designed,

20 manufactured, marketed, labeled, supplied, distributed, sold and otherwise placed in the stream of

21 commerce by Defendants contained asbestos, including asbestos and asbestiform fibers, e.g., tremolite,

22 chrysotile, and other carcinogens, which Plaintiff's Decedent used and was exposed to, and that Defendants

23 failed to warn the public, including Plaintiff's Decedent, about the fact that the talcum powder products

24 contained such carcinogenic substances.

25   107. Defendants engaged in wrongful conduct and were negligent and created a dangerous and

26 unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying,

27 distributing, designing, manufacturing, and selling the talcum powder products which contained asbestos

28 which Defendants knew or should have known was dangerous and posed a substantial risk of harm to

1 | others, including Plaintiff.

2 | 108. Title 21, Section 740.1(a) of the Code of Federal Regulations states: "The label of a cosmetic
3 | product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that
4 | may be associated with the product." 21 C.F.R. § 740.1(a). Plaintiff alleges that Defendants violated this
5 | law and that the violation was a substantial factor in bringing about harm to Plaintiff's Decedent. The label
6 | for the talcum powder product did not provide any warning regarding the health hazard that were or may
7 | be associated with the product, including the health hazards associated with talc exposure and/or exposure
8 | to asbestos.

9 | 109. Geologists, Defendants, the and CTFA—and their suppliers, experts, agents and advisors—
10 | have long known that the deposits in the earth that are associated with talc are also associated with the
11 | formation of asbestos. The United States Geological Survey on Commercial Talc production in 1965, as
12 | well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile
13 | commonly among those minerals found within talc deposits.

14 | 110. Defendants have long employed and/or consulted with doctors, scientists, geologists,
15 | mineralogists and toxicologists, and that they have long maintained extensive medical and scientific
16 | libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos
17 | and asbestiform talc fibers in talc and talc deposits.

18 | 111. Beginning in the 1930s, medical and scientific literature emerged indicating talc was
19 | commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic,
20 | such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, a growing body of
21 | medical and scientific literature demonstrated that direct and secondary exposure to talc, including
22 | asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease,
23 | cancer and death.

24 | 112. Defendants and their employees, agents and/or suppliers were members of the National
25 | Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service
26 | reported to the National Safety Council the results of a study conducted among tremolite, talc and slate
27 | workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and
28 | 45% tremolite.

113.    In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968).

114.    A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post.

115.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

116.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants and the CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder

products, such as Defendants' products.

117.    In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD"), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

118.    Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be asbestos-free. These were some of the same grades of talc used and supplied by Defendants.

119.    In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

120.    From there, the difference between what Defendants and the CTFA knew diverged from what they were representing to the FDA. Defendants, the CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

121.    Defendants and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD

testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and the CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Defendants and the CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiff's Decedent was exposed. In support of their voluntary XRD methodology, which was finally published in 1977, the CTFA produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. The CTFA, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens. Defendants and the CTFA made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, Plaintiff's Decedent, that talc-containing products contained asbestos.

122.    The CTFA and Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" means something much different than "no asbestos," but due to Defendants' repeated conflation of the terms, the public has been lead to erroneously believe talc products are safe.

123.    Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos as well as other contaminates such as Cadmium, Cobalt, Chromium, Copper, Iron, Manganese, and Nickel. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

124.    Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are therefore safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of the CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States.

125.    Defendants and the CTFA, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, Plaintiff's Decedent, regarding the hazards of exposure to carcinogens, including talc, asbestos, and fibrous talc., They also knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiff's Decedent was exposed.

126.    Defendants and the CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, Plaintiff's Decedent, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

127.    Defendants and the CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Defendants knew and should have known would be exposed thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers.

128.   Plaintiff's Decedent reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Defendants and their agent, the CTFA, regarding the hazards of talc and talcum powder products, including the failure to warn and disclose the fact that such products contained asbestos and other carcinogens, including talc itself, and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

129.   McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

130.   The CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." The CTFA met with and corresponded with Defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA, Defendants, and was advocated to the FDA by the CTFA, and Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though the CTFA and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

131.   In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that the CTFA or Defendants ever shared this remarkable failure with the FDA or the public.

132.   The FDA, and ultimately Plaintiff, directly and/or indirectly relied upon the CTFA's false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development

of such regulatory methods." The continuing lack of FDA awareness regarding the CTFA's and Defendants' misrepresentations and concealment was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, a July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" The CTFA's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices.

133. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

134. The CTFA and Defendants, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, including talc and talcum powder used in the production of products to which Plaintiff's Decedent used and was exposed.

135. The CTFA, which was Defendants' agent, along with Defendants, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including Defendants' talc powder products to which Plaintiff's Decedent was exposed. The conduct of Defendants, both acting individually and in concert with others, including the CTFA, was a substantial factor in causing harm to Plaintiff's Decedent.

136. The conduct of Defendants, independently and collectively and through their agents, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff as alleged in this complaint.

///

///

**h.** *Defendants' wrongful acts are indigenous to the State of California*

137.    Defendants' wrongful acts are connected to California in that the PRODUCTS and/or talc (mixed with asbestos fibers such as chyrysotile, anthrophyllite, and tremolite, as well as asbestiform fibers such as fibrous talc) intended for use in the PRODUCTS were analyzed, tested, marketed, advertised, distributed and sold in California and certified by Defendant IMERYS as free of asbestos and asbestiform fibers in California for sale throughout the United States.

138.    At all pertinent times, JOHNSON & JOHNSON was and continues to be connected to California through their predecessor ownership in California talc mines, mills and processing plants. JOHNSON & JOHNSON originally sourced all raw talcum powder for Johnson's Baby Powder PRODUCTS from domestic mines located in California. California served as the exclusive source of talc for JOHNSON & JOHNSON from the inception of its Johnson's Baby Powder PRODUCTS line until 1926. In 1926, JOHNSON & JOHNSON changed its sourcing of raw talcum powder from domestic mines located in California to talc sourced in Italy.

139.    In 1941, due to the outbreak of World War II and the attendant difficulties in procuring talcum powder from its Italian source, JOHNSON & JOHNSON returned to California for sourcing of its talc from approximately 1941 through 1946. After 1946, JOHNSON & JOHNSON returned to sourcing the raw talcum powder used in its PRODUCTS from Italy, specifically, Italy's Val Chisone region and its associated mines.

140.    In 1971, California talc is again investigated by JOHNSON & JOHNSON as a source for its Baby Powder PRODUCTS line when Defendants began the process of evaluating and qualifying the Grantham Mine, located in the Death Valley region of California. The Grantham ore was considered as a potential source of raw talcum powder for use in its PRODUCTS despite the fact that it was shown to contain both tremolite and chrysotile.

141.    Tremolite, chrysotile, anthophyllite, other forms of asbestos and asbestiform minerals, as well as known carcinogens such as heavy metals (including nickel, hexa-valent chromium, cadmium, cobalt, copper, iron, and manganese), as well as arsenic, quartz, silica, and lead, were known by JOHNSON & JOHNSON to be constituent minerals that were incapable of being wholly removed from the talcum powder which it used in the manufacture of its Baby Powder and Shower to Shower product lines.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

142.    For more than half a century JOHNSON & JOHNSON in concert with Defendant IMERYS performed experimental analyses and studies detailing the presence, contamination levels, and inability to mitigate, the amounts of these carcinogens in the raw talcum powder used in the PRODUCTS.

143.    At all pertinent times, Defendant IMERYS (formerly known as Luzenac America and its predecessors), and/or its predecessors in interest, were engaged in the business of mining, milling, manufacturing, research and developing, processing and testing talc in California.

144.    In 1919, the Inyo Talc Company began producing talc from a mine in Talc City, California, and a processing the talc at a mill at Keeler, California. Inyo changed its name to Sierra Talc and in 1942 Sierra Talc expanded is talc production in California with the purchase of the Pacific Coast Talc, Bay Street Mill, in California. Sierra Talc then purchased Muroc Clay Company, and the Randolph Street Mill, located in Los Angeles, California.

145.    In 1953, Defendant opened the Panamint Mine in California which was in operation for over 30 years until its close in 1986.

146.    In 1964, Cyprus Mines purchased Sierra Talc, and in 1973 the United Sierra Division became the Cyprus Industrial Minerals Company, and was renamed Cyprus Industrial Minerals Corporation. Shortly thereafter, in 1974, Cyprus Industrial Minerals relocated its headquarters to Los Angeles, California. Cyprus subsequently became a major player in the market for talcum powder, logging production of 122,000 tons and revenues of $11 million in 1976.

147.    In 1992, Rio Tinto purchased the talc assets of Cyprus Industrial Minerals, incorporating these assets as Luzenac America Incorporated. Included in these assets were the mines and processing facilities of Windsor Minerals, Inc. a former subsidiary of JOHNSON & JOHNSON which maintained significant talc producing and milling assets located in Vermont and in California.

148.    At all pertinent times, JOHNSON & JOHNSON was and continues to be connected with California by and through their dealings, communications and contracts with Defendant IMERYS. JOHNSON & JOHNSON Defendants' relationship with IMERYS was specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein.

149.    JOHNSON & JOHNSON worked closely with Defendant IMERYS for the supply and testing of its PRODUCTS. Defendant IMERYS' nucleus of operations and control center for PRODUCT

43

analysis and testing was through its the Corporate Research and Development Laboratory, which was at all relevant times, based in San Jose, California. Defendant IMERYS tested JOHNSON & JOHNSON'S talc for asbestos and asbestiform talc fibers at their California facility knowingly using faulty test methods that had "detection limits" and as such could only vouch that asbestos was "not detected." And yet, IMERYS approved the respective talc samples despite IMERYS' knowledge of the presence of deadly asbestos fibers as well as asbestiform fibers and other harmful constituents in the talc.

150. Defendant IMERYS was complicit in exposing the general public, Plaintiff's Decedent, to the PRODUCTS through the testing of talcum powder supplied to JOHNSON & JOHNSON using a knowingly flawed, inaccurate and imprecise, methodology at its California Corporate Laboratory where research and development, analysis, testing and the approval of talc supplies for Defendants' PRODUCTS were conducted. Defendant IMERYS' California Corporate Laboratory was the quality control nerve center for JOHNSON & JOHNSON'S PRODUCTS.

151. The testing methodology employed by Defendant IMERYS in qualifying its raw talcum powder as "free of asbestos" is incapable of ensuring the absence of harmful asbestos and asbestiform talc fibers, and was developed by members of the industry, through the auspices of its trade group, the CTFA, as a means of avoiding more accurate, and precise testing protocols. To this day, Defendant IMERYS continues to use this flawed testing methodology in qualifying its ore as "free of asbestos".

152. Defendant IMERYS further tested the raw talcum powder supplied to JOHNSON & JOHNSON through a second proprietary testing method developed by JOHNSON & JOHNSON. Such testing is a pre-requisite to maintaining its status as a supplier of talc to JOHNSON & JOHNSON.

153. Despite knowledge by JOHNSON & JOHNSON that the testing methodology used in detecting and quantifying the level of asbestos and asbestiform fibers in the PRODUCTS was incapable of ensuring the complete absence of the same, JOHNSON & JOHNSON has, and continues to, market its PRODUCTS as "free from asbestos and asbestiform fibers".

154. In addition to asbestos, JOHNSON & JOHNSON knew or should have known that the talcum powder used in the PRODUCTS contained other harmful constituents, including arsenic, quartz, silica, and heavy metals such as nickel, cadmium, cobalt, copper, iron, manganese and chromium. JOHNSON & JOHNSON'S contracts, communications and business relationships with several testing

1  laboratories in California were specifically related to Defendants' talc and the PRODUCTS, and thus is

2  and was specific to the issues herein.  JOHNSON & JOHNSON contracted with EXOVA Inc. in Sante Fe

3  Springs, California and the RJ LEE GROUP in Berkeley, California to test for harmful carcinogens and

4  other harmful constituents in the PRODUCTS.  In addition, Forensic Analytical located in Hayward,

5  California also tested the PRODUCTS for JOHNSON & JOHNSON.

6      155.   At all pertinent times, JOHNSON & JOHNSON communicated with Defendant IMERYS'

7  California Corporate Laboratory on asbestos testing methods and standards. As part of their agreements to

8  test JOHNSON & JOHNSON'S PRODUCTS, Defendant IMERYS relied on testing by Intertek, a testing

9  laboratory with several California locations including its North American Consumer Goods location in El

10 Segundo, California.

11     156.   At all pertinent times, Defendant IMERYS' California Corporate Laboratory managers

12 made presentations throughout California (among other places) promoting IMERYS' flawed testing

13 techniques and methodologies at several industrial mineral conferences, including but not limited to the

14 California Society of Cosmetic Chemists, the ASTM conferences and the Michael E. Beard Asbestos

15 Conferences.

16     157.   JOHNSON & JOHNSON and IMERYS worked in concert to obtain a favorable

17 determination by the Cosmetic Ingredient Review that their talc was safe, despite evidence to the contrary.

18     158.   Further, Defendants JOHNSON & JOHNSON and IMERYS have undertaken a concerted

19 and extensive effort to influence both regulators and the prevailing body of scientific evidence that talcum

20 powder PRODUCTS are not carcinogenic, and that they contain no other carcinogenic constituents such

21 as asbestos and asbestiform fibers.  This effort has consisted of contracting with, and soliciting the input

22 of, numerous California thought leader scientists to offer opinions, author peer-reviewed articles and

23 supplemental analyses of the PRODUCTS in order to fend of negative publicity and government regulation

24 aimed at mandating labeling requirements on cosmetic talcum powder PRODUCTS. JOHNSON &

25 JOHNSON'S contracts, communications and business relationships with thought leaders and academic

26 institutions in California were specifically related to Defendants' talc and the PRODUCTS, and thus is and

27 was specific to the issues herein.

28 / / /

45

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

159.    JOHNSON & JOHNSON contracted with the noted California thought leader scientist Dr. Hoda Anton- Culver of UC Irvine and Dr. Dwight Culver in formulating a response to discredit a significant talc inhalation study undertaken by the NTP in 1992. Dr. Dwight Culver, an occupational physician and consulting medical director to U.S. Borax (a subsidiary of Rio Tinto in Boron, California), provided consulting services to JOHNSON & JOHNSON, along with his wife, Dr. Hoda Anton-Culver, the Director of Epidemiology at the University of California-Irvine.

160.    JOHNSON & JOHNSON also contracted with California thought leader Professor Gordon E. Brown, Professor of Mineralogy and Geochemist at Stanford University, to refute and discredit the analysis of JOHNSON & JOHNSON'S PRODUCT samples of tested by Dr. Lewin (see discussion below) who found Defendants' PRODUCTS contained asbestos. JOHNSON & JOHNSON continues to contract with Professor Brown as a thought leader consultant on a range of analyses and testing issues related to the safety of its PRODUCTS.

161.    JOHNSON & JOHNSON also employed California thought leader Dr. Donald Dungworth of the University of California-Davis as a consultant in order to prevent the NTP from classifying talc as a carcinogen. Defendant JOHNSON & JOHNSON used Dr. Dungworth and his research in order convince the NTP to disregard studies where rats and mice exposed to talc suffered from cancer and/or lung disease.

162.    JOHNSON & JOHNSON also sought the services of thought leader experts in occupational medicine, Dr. Clark Cooper and Dr. Irving Tabershaw, of the University of California Berkeley School of Public Health. Drs. Cooper and Tabershaw operated a consulting business known as Tabershaw-Cooper Associates.

163.    JOHNSON & JOHNSON sought to influence the work of the Stanford Research Institute ("SRI"), based at Stanford University in California, in order to achieve favorable regulatory decisions in the late 1970s. The U.S. National Institute for Occupational Safety and Health ("NIOSH") contracted SRI for assistance with an official "criteria document" on talc. Defendants were aware that any decision by NIOSH would be based largely on findings by SRI and so hoped to influence both. To that end, Defendants hosted a delegation from NIOSH and SRI at one of their facilities to convince them that their "cosmetic-grade" talc was free of asbestos and posed no health risks.

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

164.    At all pertinent times, JOHNSON & JOHNSON has maintained and continues to maintain a substantial presence and a vested financial interest in California with the presence of ten locations across the State in Fremont, CA, Irvine, CA; Irwindale, CA; La Jolla, CA; Menlo Park, CA; Milpitas, CA; Sacramento, CA; San Diego, CA; South San Francisco, CA; and Vacaville, CA.

165.    JOHNSON & JOHNSON'S California Innovation Center in Silicon Valley was recently created to develop relationships between JOHNSON & JOHNSON, California scientists, and their respective companies in the Western United States.

166.    JOHNSON & JOHNSON'S Research and Development laboratory in San Diego, known as JLABS, houses scientific development by "resident companies" in the health care, pharmaceutical, and consumer goods markets, in which JOHNSON & JOHNSON invest, as a means to further establish relations with California and West Coast Scientists and Companies.

167.    To expand their product lines even further in California market, JOHNSON & JOHNSON recently established JJDC, INC, an investment venture fund, to incubate and develop start-ups in California.

168.    At all pertinent times, JOHNSON & JOHNSON has maintained and continues to maintain an office in Sacramento, California dedicated to lobbying efforts encompassing issues, among other issues, Proposition 65 and the classifications of carcinogens, including talc used in Defendants' PRODUCT. JOHNSON & JOHNSON'S lobbying efforts in California were related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein. In the last fifteen years, JOHNSON & JOHNSON spent over ten million dollars ($10,000,000) to influence the laws and regulations of the State of California.

169.    At all pertinent times, California's Proposition 65 was of particular interest to JOHNSON & JOHNSON, as labeling requirements on consumer goods flowing from the recognition of talcum powder as a carcinogen would have triggered labeling requirements on JOHNSON & JOHNSON's Baby Powder and Shower to Shower PRODUCTS which it had sought to avoid since the early 1970's when the FDA first began considering labeling and regulation of talcum powder and talcum powder containing PRODUCTS.

///

170.    With full knowledge of the ultra-hazardous nature of the PRODUCTS, JOHNSON & JOHNSON marketed, sold, promoted, and distributed these PRODUCTS across the country through a nationwide distribution network with locations in; New Brunswick, New Jersey; Savannah, Georgia; Chicago; Illinois; Los Angeles, California; and Dallas, Texas.

171.    At all pertinent times, JOHNSON & JOHNSON targeted California in their advertising and marketing strategies, and reaped significant profits from purchasers of their PRODUCTS. JOHNSON & JOHNSON'S contracts, communications and business relationships with several advertising, marketing, media and public relations firms in California was specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein. JOHNSON & JOHNSON implemented an aggressive strategy to expand their PRODUCT sales specifically to Hispanic women. With the nation's largest Hispanic population, California and specifically California Hispanic women were and continue to be an important strategic market for Defendants' PRODUCTS.

172.    At all pertinent times, JOHNSON & JOHNSON hired, supervised and directed third party media and public relations companies with offices in both Northern and Southern California to create sophisticated Spanish-language newspaper, magazine, billboard, radio, and television marketing and advertising campaigns to promote the PRODUCTS specifically to California Hispanic women. JOHNSON & JOHNSON'S campaign was so successful that Defendants created and produced a Spanish-language Johnson's Baby Powder bottle for placement on, among other locations, California grocery, pharmacy and big-box store (Target, Walmart, Kmart) shelves through-out the State.

173.    At all pertinent times, JOHNSON & JOHNSON paid substantial funds to purchase California media from California advertising and marketing agencies to target the women of California, and specifically target the Hispanic women of California, into purchasing their Baby Powder PRODUCTS while knowingly concealing the fact that the PRODUCTS contained the carcinogenic substances talc, asbestos and asbestiform fibers which posed a high risk of ovarian cancer and/or death.

174.    The defective and dangerous PRODUCTS which were manufactured, produced, analyzed, tested and distributed throughout the United States without warnings of the ovarian cancer hazard caused by talc itself and/or the presence of asbestos, asbestiform fibers, and other harmful constituents in the talc, and/or not using a safer alternative to talc such as cornstarch, based on the foregoing activities, give rise to

1  an actionable conspiracy and the concert of action arose from and was connected with Defendants' conduct

2  in the forum State of California

3      175.   Defendants' liabilities arise from and relate to these contacts with the forum of the State of

4  California.

5      176.   Defendants purposefully affiliated themselves with the forum of the State of California

6  giving rise to the underlying controversy.  Such purposeful availment and activities within and related to

7  the State of California included, but are not limited to, the Defendants' contractual relationships with the

8  entities and discussed above giving rise to the source, supply, manufacturing, production, research and

9  testing, analyzing, processing, distribution, advertising and marketing of the PRODUCTS in the State of

10 California and being controlled and directed from the State of California; agreements between Defendants

11 and entities, institutions and thought leader academics within State of California regarding the PRODUCTS

12 where Defendants contractually consented to have state courts within the State of California adjudicate

13 disputes; marketing and advertising of the PRODUCTS by Defendants targeted specifically to women

14 within the State of California as opposed to the Nation as a whole; agreements and other arrangements

15 between Defendants and hospitals and other healthcare providers specific to the State of California where,

16 for example, expectant and post-partum mothers were provided gift baskets containing the PRODUCTS;

17 conferences, tradeshows and other promotional activities by Defendants with regard to the PRODUCTS

18 targeted specifically to the State of California; lobbying, consulting, and advisory efforts on behalf of

19 Defendants with regard to the PRODUCTS stemming from law firms and other agents in the State of

20 California; and other actions by Defendants targeted to the State of California to be obtained through

21 discovery and other means.  As the location from which Defendants' suit-related conduct arose out of,

22 California has a substantial vested interest in the acts of Defendants which led to the underlying

23 controversy.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Negligence

#### (Against All Defendants)

177.   Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

178.   Negligence is the failure to use reasonable care to prevent harm to another person.

179.   Plaintiff claims that Plaintiff's Decedent was harmed by Defendants' negligence. Plaintiff's Decedent bought and used the talcum powder products.  Decedent's perineal use of the talcum powder products was a substantial factor in causing her harm.

180.   Defendants designed, manufactured, supplied, inspected, tested, distributed and sold the talcum powder product.

181.   Defendants were negligent. Defendants were negligent in designing, manufacturing, supplying, inspecting, testing, distributing, and selling the talcum powder products.

182.   Defendants failed to use reasonable care to prevent harm to others, including Plaintiff's Decedent.

183.   Plaintiff's Decedent was harmed.

184.   Defendants' negligence was a substantial factor in causing harm to Plaintiff's Decedent.

### SECOND CAUSE OF ACTION

#### Presumption of Negligence *Per Se*

#### (Against All Defendants)

185.   Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

186.   Title 21, Section 740.1(a) of the Code of Federal Regulations states: "The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." 21 C.F.R. § 740.1(a).

187.   Defendants violated this law.

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    188.    The violation was a substantial factor in bringing about the harm suffered by Plaintiff's
2    Decedent.

3                                    **THIRD CAUSE OF ACTION**

4                                    **Negligent Failure to Warn**

5                                    **(Against All Defendants)**

6    189.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth
7    herein.

8    190.    Plaintiff claims that Defendants were negligent by not using reasonable care to warn or
9    instruct about the talcum powder product's dangerous condition or about facts that made the product likely
10   to be dangerous.

11   191.    Defendants manufactured, distributed or sold the product.

12   192.    Defendants knew or reasonably should have known that the product was dangerous or was
13   likely to be dangerous when used or misused in a reasonably foreseeable manner;

14   193.    Defendants knew or reasonably should have known that users would not realize the danger.

15   194.    Defendants failed to adequately warn of the danger or instruct on the safe use of the product.

16   195.    A reasonable manufacturer, distributor, or seller under the same or similar circumstances
17   would have warned of the danger or instructed on the safe use of the product.

18   196.    Plaintiff's Decedent was harmed.

19   197.    Defendants' failure to warn or instruct was a substantial factor in causing harm to Plaintiff's
20   Decedent.

21   198.    Plaintiff also alleges that Defendants failed to provide any warning about the dangers of the
22   talcum powder products to consumers, including Plaintiff's Decedent, after it was sold.

23   199.    Defendants manufactured, distributed and sold the product.

24   200.    Defendants knew or reasonably should have known that the product was dangerous or was
25   likely to be dangerous when used in a reasonably foreseeable manner.

26   201.    Defendants were aware of this danger and defect both before and after the product was sold.

27   202.    Defendants failed to recall the product or warn of the danger of the product.

28   / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

203.    A reasonable manufacture, distributor or seller under the same or similar circumstances would have recalled the product or provided a post-sale warning.

204.    Plaintiff's Decedent was harmed.

205.    Defendants' failure to recall the product or provide a warning was a substantial factor in causing harm to Plaintiff's Decedent.

**FOURTH CAUSE OF ACTION**

**Strict Liability - Design Defect**

**(Against All Defendants)**

206.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

207.    Plaintiff claims that Plaintiff's Decedent was harmed by a product tested, distributed, manufactured, and/or sold by Defendants that was defectively designed.

208.    Plaintiff claims the product's design was defective because the talcum powder product did not perform as safely as an ordinary consumer would have expected it to perform.

209.    Defendants manufactured, distributed or sold the talcum powder product.

210.    The talcum powder product did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

211.    Plaintiff's Decedent was harmed.

212.    The talcum powder product's failure to perform safely was a substantial factor in causing harm to Plaintiff's Decedent.

213.    As an alternative to the consumer expectations test, Plaintiff also claims that the talcum powder product was defectively designed under the risk-benefit test.

214.    Defendants manufactured, distributed or sold the product.

215.    The talcum powder product's design was a substantial factor in causing harm to Plaintiff's Decedent.

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**FIFTH CAUSE OF ACTION**

**Strict Liability – Failure to Warn**

**(Against All Defendants)**

216.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

217.    Plaintiff claims that the talc powder products lacked sufficient warnings of the potential risks.

218.    Defendants manufactured, distributed, and/or sold the talc powder products.

219.    The talc powder products had potential risks that were known or knowable in light of scientific and medical knowledge at the time of the manufacture, distribution and/or sale of the talc powder products.

220.    The potential risks presented a substantial danger when the talc powder products were used in an intended or reasonably foreseeable way.

221.    Ordinary consumers would not have recognized or known about the potential risks.

222.    Defendants failed to adequately warn of the potential risks.

223.    Plaintiff's Decedent was harmed.

224.    The lack of sufficient warnings was a substantial factor in causing harm to Plaintiff's Decedent.

**SIXTH CAUSE OF ACTION**

**Breach of Warranty**

**(Against All Defendants)**

225.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

226.    Plaintiff claims that she was harmed by the talcum powder product because Defendants represented, either by words or actions, that the talcum powder product was safe, but the product was not safe and was not as it was warranted to be.

227.    The talcum powder product did not have the quality that a buyer, consumer, or user would expect.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1      228.   Defendants were in the business of selling the talcum powder products and held themselves

2  out as having special knowledge regarding the talcum powder products.

3      229.   The talcum powder products were not safe for perineal use.

4      230.   The talcum powder product failed to perform as safely as it was warranted to be.

5      231.   Plaintiff has been harmed.

6      232.   The failure of the talcum powder product to be as represented and warranted and to have

7  the expected safety was a substantial factor in causing harm to Plaintiff's Decedent.

8                  **SEVENTH CAUSE OF ACTION**

9              **Fraud – Intentional Misrepresentation**

10                **(Against All Defendants)**

11      233.   Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth

12  herein.

13      234.   Plaintiff claims that Defendants made a false representation that harmed her.

14      235.   Defendants represented to consumers, including Plaintiff, that the talcum powder products

15  were safe.

16      236.   Defendants' representation was false.

17      237.   Defendants knew that the representation was false when it was made, or made the

18  representation recklessly and without regard for its truth.

19      238.   Defendants intended that consumers, including Plaintiff, rely on the representation.

20      239.   Plaintiff's Decedent reasonably relied on Defendants' representation.

21      240.   Plaintiff's Decedent was harmed.

22      241.   Decedent's reliance on Defendants' representation was a substantial factor in causing her

23  harm.  Decedent's perineal use of talc was a substantial factor in causing her harm.

24      242.   Plaintiff's Decedent would not have used the talcum powder products had she known the

25  truth about the dangers and risks posed by the talcum powder products which Defendants misrepresented

26  and concealed.

27  ///

28  ///

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**EIGHTH CAUSE OF ACTION**

**Fraud – Concealment**

**(Against All Defendants)**

243.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

244.    Plaintiff claims that she was harmed because Defendants concealed certain information about the dangers and risks of the talcum powder products.

245.    Defendants had a duty to disclose material information regarding the safety hazards, dangers and risks posed by the talcum powder products to consumers, including Plaintiff.

246.    Defendants intentionally failed to disclose certain facts to the public and consumers, including Plaintiff.

247.    In addition, Defendants disclosed some facts, but intentionally failed to disclose other facts, making what disclosures they did make deceptive.

248.    Defendants intentionally failed to disclose certain facts that were known only to them and their agents, and that consumers, including Plaintiff, could not have discovered.

249.    By virtue of their conduct, Defendants prevented the public and consumers, including Plaintiff, from discovering certain facts regarding the safety hazards, dangers and risks posed by perineal use of the talcum powder products which Defendants concealed.

250.    Plaintiff's Decedent did not know of the concealed facts.

251.    Defendants intended to deceive consumers, including Plaintiff, by concealing the facts.

252.    Had the omitted information been disclosed, Plaintiff's Decedent reasonably would have behaved differently.  She would not have used the talcum powder products which ultimately caused the harm she has suffered.

253.    Plaintiff's Decedent was harmed.

254.    Defendants' concealment was a substantial factor in causing harm to Plaintiff's Decedent.

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**NINTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against All Defendants)**

255.  Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

256.  Plaintiff's Decedent was harmed because Defendants negligently misrepresented that the talcum powder products were safe.

257.  Defendants represented to consumers, including Plaintiff, that the talcum powder products were safe.

258.  Defendants' representation was not true.

259.  Defendants had no reasonable grounds for believing the representation was true when it was made.

260.  Defendants intended that consumers, including Plaintiff, believe and rely on the representation that the talcum powder products were safe.

261.  Plaintiff's Decedent reasonably relied on Defendants' representation and believed that the talcum powder products were safe.

262.  Plaintiff's Decedent would not have used Defendants' talcum powder products had she known the truth.

263.  Plaintiff's Decedent was harmed.

264.  Decedent's reliance on Defendants' representation that the talcum powder products were safe was a substantial factor in causing her harm.

**TENTH CAUSE OF ACTION**

**Wrongful Death**

**(Against All Defendants)**

265.  Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

266.  Plaintiff is a surviving heir of Decedent, as identified above, who used the PRODUCTS and was injured and died as a result. Said Decedent purchased, was supplied with, received, applied, used and

56

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

consumed said PRODUCTS as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., Defendants DOES 1 through 100, inclusive, and the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint, which contained the talc product as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, sold or otherwise placed in the stream of interstate commerce by Defendant IMERYS TALC AMERICA, INC., Defendants DOES 1 through 100, inclusive, and the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint.

267.    The injuries and damages of Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

268.    As a result of the conduct of Defendants and the Decedent's use of the PRODUCTS, the Decedent suffered fatal injuries.

269.    As a result of the death of the Decedent, Plaintiff was deprived of love, companionship, comfort, support, affection, society, solace and moral support of the Decedent.

270.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' PRODUCTS and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

## ELEVENTH CAUSE OF ACTION

### Survival Action

### (Against All Defendants)

271.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

272.    Decedent incurred special damages in the form of the reasonable value of services rendered for medical care for the injuries that Decedent sustained prior to death, all caused by the Decedent's

1  exposure to the PRODUCTS. Plaintiff is the personal representative or a successor in interest and

2  authorized to bring this survival action on behalf of the Decedent's Estate pursuant to Code of Civil

3  Procedure § 377.31, et seq.

4      273.  Plaintiff incurred special damages for losses sustained by the Decedent in the form of the

5  reasonable value of services rendered for medical care for the injuries sustained by the Decedent prior to

6  death, lost earnings and other special damages.

7      274.  As a direct and proximate result of the defects in the PRODUCTS and the conduct of

8  Defendants, Plaintiff and Plaintiff's Decedent sustained the damages as set forth above.

9              **TOLLING STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES**

10     275.  Plaintiff hereby incorporates by reference all other paragraphs of this Complaint.

11     276.  Plaintiff's Decedent suffered illnesses that have latency periods and do not arise until many

12  years after exposure. The illnesses did not distinctly manifest as having been caused by the PRODUCTS

13  until Plaintiff was made aware that the ovarian cancer could be caused by use of the PRODUCTS.

14  Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the

15  day that Plaintiff knew or had reason to know that ovarian cancer was linked to the use of the PRODUCTS.

16     277.  Furthermore, the running of any statute of limitations has been equitably tolled by reason

17  of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and

18  omissions, Defendants actively concealed from Plaintiff the true risks associated with the talcum powder

19  contained within the PRODUCTS.

20     278.  As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know,

21  or could not have reasonably learned through reasonable diligence, that Plaintiff's Decedent had been

22  exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants'

23  acts and omissions.

24     279.  Furthermore, Defendants are estopped from relying on any statute of limitations because of

25  their concealment of the truth, quality and nature of the PRODUCTS. Defendants were under a duty to

26  disclose the true character, quality and nature of PRODUCTS because this was non-public information

27  which the Defendants had and continue to have in their exclusive control, and because the Defendants

28  knew that this information was not available to Plaintiff.

280.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

281.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, in representations to the Plaintiff's Decedent and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

• that the PRODUCTS were not as safe as other products available;

• that the PRODUCTS were dangerous; and

• that the PRODUCTS were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

282.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were under a duty to disclose to Plaintiff's Decedent, and the public in general, the defective nature of the PRODUCTS.

283.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire to induce the consumers, including Plaintiff's Decedent, to rely on such misrepresentations in selecting, purchasing and using the PRODUCTS.

284.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made these misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS in the labeling, advertising, promotional material or other marketing efforts.

285.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, these representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made

1  recklessly and without regard to the true facts.

2    286.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times
3  alleged herein, the misrepresentations and active concealments by Defendants were perpetuated directly
4  and indirectly by Defendants, their sales representative, employees, distributors, agents, marketers and
5  detail persons.

6    287.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times
7  alleged herein, at the time the representations were made, Plaintiff's Decedent did not know the truth about
8  the dangers and serious health and/or safety risks inherent in the use of the PRODUCTS.  Plaintiff's
9  Decedent did not discover the true facts about the dangers and serious health and/or safety risks, nor did
10 Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence
11 have discovered the true facts or Defendants' misrepresentations.

12   288.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times
13 alleged herein, Defendants knew that Plaintiff's Decedent, and the public in general, had no way to
14 determine the truth behind Defendants' concealment and omissions, and that these included material
15 omissions of facts surrounding the PRODUCTS, as set forth herein.

16   289.   Had Plaintiff's Decedent known the true facts about the dangers and serious health and/or
17 safety risks of the PRODUCTS, Plaintiff's Decedent would not have purchased, used, or relied on
18 Defendants' PRODUCTS.

19   290.   Defendants had a duty when disseminating information to the public to disseminate truthful
20 information and a parallel duty not to deceive the public, including Plaintiff's Decedent.

21   291.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times
22 alleged herein, the information distributed to the public and Plaintiff's Decedent by Defendants included,
23 but was not limited to, reports, press releases, advertising campaigns, television commercials, print
24 advertisements, billboards and other commercial media containing material representations, which were
25 false and misleading, and contained omissions and concealment of the truth about the dangers of the use
26 of the PRODUCTS.

27   292.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times
28 alleged herein, Defendants intentionally made material misrepresentations to the medical community and

public, including Plaintiff's Decedent, regarding the safety of the PRODUCTS, specifically that the PRODUCTS did not have dangerous and/or serious adverse health safety concerns, and that the PRODUCTS were as safe as other products.

293.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiff's Decedent; to gain the confidence of the public, the medical community, and Plaintiff's Decedent, to falsely assure them of the quality and fitness for use of the PRODUCTS; and induce Plaintiff's Decedent and the public to use the PRODUCTS.

294.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the PRODUCTS to the public at large, for the purpose of influencing the sales of PRODUCTS known to be dangerous and defective, and/or not as safe as other alternatives.

295.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, at all times relevant to this action, Defendants knew that the PRODUCTS were not safe for consumers.

296.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

297.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the Defendants' advertising and marketing efforts, and representations, the PRODUCTS are and continue to be pervasively manufactured and used in California and throughout the United States.

298.    Plaintiff is informed and believes, and based thereon alleges, at all relevant times alleged herein, the acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff's Decedent and other users of the PRODUCTS and for the primary purpose of increasing

Defendant's profits from the sale and distribution of the PRODUCTS. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

299.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and each of them, knew that the PRODUCTS were in a defective condition as previously alleged herein and knew that those who used the PRODUCTS would experience and did experience severe injuries. Further, Defendants and each of them through its officers, directors, managers, and agents, had knowledge that the PRODUCTS presented a substantial and unreasonable risk of harm to the public, including Plaintiff's Decedent and, as such, consumers of the PRODUCTS were unreasonably subjected to risk of injury.

300.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the PRODUCTS and failed to warn the public, including Plaintiff's Decedent, of the extreme risk of injury occasioned by said defects inherent in the PRODUCTS. Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the PRODUCTS knowing that the public, including Plaintiff's Decedent, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

301.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiff to exemplary damages under California Civil Code section 3294.

302.   Plaintiff filed this lawsuit within the applicable limitations period of first suspecting that the PRODUCTS were the cause of any appreciable harm sustained by Plaintiff's Decedent, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries. Plaintiff's Decedent could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the

causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known. Plaintiff's Decedent did not suspect, nor did Plaintiff have reason to suspect, that wrongdoing had caused the injuries until recently. Plaintiff filed the original action within two years of discovering the causes of action and identities of Defendants.

303.   Plaintiff had no knowledge of the defects in the PRODUCTS or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff have access to information regarding other injuries and complaints in the possession of Defendants. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the PRODUCTS are safe and free from defects, and Defendants fraudulently concealed information to allow Plaintiff to discover a potential cause of action sooner.

304.   Plaintiff has reviewed her potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state-law. Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question. Plaintiff chooses to only pursue claims based on state law and is not making any claims that raise federal questions.

## RELIEF REQUESTED

WHEREFORE, Plaintiff STEVE HAGGERTY prays for judgment against Defendants JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC., Defendant IMERYS TALC AMERICA, INC., Defendants DOES 1 through 100, inclusive, and the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint, jointly and severally, and as appropriate to each cause of action alleged and the standing of Plaintiff as follows:

1.   Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.   Past and future economic and special damages according to proof at the time of trial;

3.   Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.   Medical expenses, past and future, according to proof at the time of trial;

5.   Funeral expenses and other special damages according to proof at the time of trial;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    6.      Punitive or exemplary damages according to proof at the time of trial;

2    7.      Attorney's fees;

3    8.      For costs of suit incurred herein;

4    9.      For pre-judgment interest as provided by law; and

5    10.     For such other and further relief as the Court may deem just and proper.

6

7    Dated:   January 31, 2019                    Respectfully submitted,

8                                                ROBINSON CALCAGNIE, INC.

9                                        By:   _Mark P. Robinson, Jr._

10                                              Mark P. Robinson, Jr. Esq.

11

12

13

14                        **DEMAND FOR JURY TRIAL**

15    Plaintiff STEVE HAGGERTY hereby demands a jury trial on all counts in this Complaint.

16

17                                             Respectfully submitted,

18    Dated:   January 31, 2019                  ROBINSON CALCAGNIE, INC.

19

20                                       By:   _Mark P. Robinson, Jr._

21                                              Mark P. Robinson, Jr. Esq.

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2019-00006541-CU-MT-CTL      CASE TITLE: Haggerty vs Johnson & Johnson [E-File]

**NOTICE: All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:**

> **(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),**
> **(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_**
> **(3) the Notice of Case Assignment form (SDSC form #CIV-721).**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

### Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| **Potential Advantages** | **Potential Disadvantages** |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

### Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:**  There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.  Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

**Local ADR Programs for Civil Cases**

**Mediation:**  The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection:  Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005).  The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:**  The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:**  The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience.  Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:**  The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:**  To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

**Legal Representation and Advice**

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS:  330 W Broadway | |
| MAILING ADDRESS:  330 W Broadway | |
| CITY AND ZIP CODE:  San Diego, CA 92101-3827 | |
| BRANCH NAME:  Central | |
| TELEPHONE NUMBER:  (619) 450-7070 | |

| PLAINTIFF(S) / PETITIONER(S):   Steve Haggerty | |
|---|---|

| DEFENDANT(S) / RESPONDENT(S):  Johnson & Johnson et.al. | |
|---|---|

| HAGGERTY VS JOHNSON & JOHNSON [E-FILE] | |
|---|---|
| **NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE on MANDATORY eFILE CASE** | CASE NUMBER:<br>37-2019-00006541-CU-MT-CTL |

## CASE ASSIGNMENT

Judge:  Randa Trapp                                   Department: C-70

### COMPLAINT/PETITION FILED: 02/01/2019

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 09/20/2019 | 09:30 am | C-70 | Randa Trapp |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

MANDATORY eFILE: Case assigned to mandatory eFile program per CRC 3.400-3.403 and SDSC Rule 2.4.11. All documents must be eFiled at www.onelegal.com.  Refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases or guidelines and procedures.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS:  330 West Broadway | |
| MAILING ADDRESS:  330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA  92101-3827 | |
| BRANCH NAME:  Central | |

| PLAINTIFF(S):    Steve Haggerty |
|---|

| DEFENDANT(S): Johnson & Johnson et.al. |
|---|

| SHORT TITLE:    HAGGERTY VS JOHNSON & JOHNSON [E-FILE] |
|---|

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2019-00006541-CU-MT-CTL |
|---|---|

Judge: Randa Trapp                                    Department: C-70

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐  Mediation (court-connected)                ☐  Non-binding private arbitration

☐  Mediation (private)                        ☐  Binding private arbitration

☐  Voluntary settlement conference (private)  ☐  Non-binding judicial arbitration (discovery until 15 days before trial)

☐  Neutral evaluation (private)               ☐  Non-binding judicial arbitration (discovery until 30 days before trial)

☐  Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____        Date: _____

_____        _____
Name of Plaintiff                                Name of Defendant

_____        _____
Signature                                        Signature

_____        _____
Name of Plaintiff's Attorney                     Name of Defendant's Attorney

_____        _____
Signature                                        Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  02/04/2019                                _____
                                                 JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)        **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**        Page: 1